# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BRENDA NIXON, individually, and on behalf of all others similarly situated,<br>        Plaintiff,<br><br>v.<br><br><br>GRANDE COSMETICS, LLC,<br>     Defendant | Case No. 1:22-cv-06639 |

**PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND <u>INCORPORATED MEMORANDUM OF LAW</u>**

## I.      INTRODUCTION

Plaintiff Brenda Nixon respectfully moves for preliminary approval of the proposed class action settlement agreement attached hereto as Exhibit A (the "Settlement") and for preliminary certification of the nationwide Settlement Class, which will resolve Plaintiff's and all proposed Settlement Class Members' claims in this action concerning the marketing of GrandeLASH-MD Lash Enhancing Serum, GrandeBROW Brow Enhancing Serum, and GrandeHAIR Enhancement Serum ("the Products" or "the Serums").  Defendant Grande Cosmetics, LLC ("Grande") does not oppose this motion.

Preliminary approval should be granted because the Settlement provides substantial relief for the Settlement Class, and the Settlement's terms are fair, adequate, and reasonable. Under the Settlement, Grande will commit $6,250,000 (all cash, no coupon) to a non-reversionary fund from which each Settlement Class Member may receive a pro rata share in an amount up to $150.00, and potentially more if they purchased multiple products and any funds remain after an initial distribution. Further, pursuant to the Settlement, Grande has agreed to marketing and business-practice changes to enhance the warnings and instructions on the Products' packaging and other marketing materials. Thus, future customers, including Settlement Class Members, will have enhanced information about the Products' ingredients and be able to make more informed decisions than before.

1

The Settlement provides more robust, guaranteed relief for the Settlement Class than the disapproved settlement in *Mandel v. Grande Cosmetics, LLC*, No. 3:22-cv-00071 (N.D. Cal.).   There, a different plaintiff, represented by different counsel, sought preliminary approval of a nationwide class settlement with different (and inferior) terms as Plaintiff now presents to the Court here.  The *Mandel* court denied preliminary approval for three principal reasons: (i) 20% of the settlement's purported value ($1,250,000) came from coupons; (ii)  it deemed the cash value of $5,000,000 was insufficient; and (iii) the parties did not adequately explain their speculative 3% claims rate. *See* Ex. B (*Mandel* minute order denying preliminary approval); Ex. C (transcript of hearing in *Mandel* in which court denied preliminary approval).  The parties in *Mandel* were unable to negotiate a revised  settlement with improved terms for the class.

The Settlement here directly addresses each of the issues that gave the *Mandel* court pause:

*First*, the Settlement here completely eliminates coupons, and converts the entirety of that amount into non-reversionary cash added to the settlement fund, resulting in a $6,250,000 fund of non-reversionary cash.  This is a 20% increase in cash value over the $5,000,000 available cash in the rejected *Mandel* settlement. Once anticipated attorneys' fees and costs, a service award, and class notice costs are deducted, the net cash value available to eligible claimants will be ~$3,577,000,

versus only ~$2,351,667 that would have been available in *Mandel*.  In other words, the Settlement here features a 52% increase in net cash value available to Settlement Class Members over that which would have been available under the rejected *Mandel* settlement.

*Second*, Grande estimates the class size is between 800,000 and 1,000,000 consumers, significantly less than plaintiff estimated in its motion for preliminary approval in the *Mandel* case.  Grande cannot confirm the exact class size because its sale of the Serums is primarily through third-party retailers that do not maintain consumer information, and thus cannot provide the resale rate for the Serums. However, Grande's estimate is based on having a similar resale rate to its competitors, including Rodan+Fields, that sell competing eyelash serums containing isopropyl cloprostenate ("ICP") while taking into account the different average sale price of the subject competing products.  Combined with the 20% increase in cash value, each eligible claimant stands to receive approximately $51, which reflects a ~75% recovery on purchasers for Grande's best-selling product that sells for $68. This per-claim recovery is higher than the estimated $23-$38 recovery (or 34% to 55% of purchase price) under the rejected *Mandel* settlement. The estimated recovery rate is also greater than any reasonable price premium Plaintiff could provide if the case were litigated.

*Third*, the Settlement contemplates the same notice program proposed in *Mandel*, plus multiple enhancements to increase the notice reach and claims rate. *See* Ex. E (Weisbrot Decl.).

*Fourth*, the Settlement otherwise tracks the *Mandel* settlement's other terms that the *Mandel* court took no issue with, including the contours of the class, the scope of release (e.g., individual personal injury or disease claims are expressly excluded), and the robust injunctive relief (e.g., enhanced warnings and disclosures to be added to the Products' labeling, etc.). The *Mandel* settlement was negotiated with the assistance of a mediator, and tracked terms from a prior class settlement of a competing serum product sold by Rodan+Fields (*see infra* Part III.C) that was approved by the Superior Court of California, San Francisco County. As an experienced plaintiff's counsel thought the *Mandel* settlement was fair, adequate, and reasonable, than certainly the Settlement here, which features objectively better terms, passes muster.

Simply put, the Settlement here is objectively superior to the rejected *Mandel* settlement in every way. The Settlement is fair, adequate, and reasonable, whether viewed in comparison to the *Mandel* settlement, or on its own. For these reasons, discussed more fully below, Plaintiff asks this Court to issue an order preliminarily approving the Settlement, appointing Plaintiff as settlement class representative,

appointing undersigned as Class Counsel, approving the class notice program, and setting a date for a final approval hearing.

## II.   BACKGROUND

### A.   Summary of This Action

Plaintiff commenced this action by filing a putative class action complaint on November 16, 2022, styled as *Nixon v. Grande Cosmetics, LLC*, No.1:22-cv-06639 (D.N.J.) ("*Nixon I*").  Plaintiff's complaint alleges that Grande misleadingly sold dangerous beauty products (GrandeLASH-MD Lash Enhancing Serum, GrandeBROW Brow Enhancing Serum, and GrandeHAIR Enhancement Serum (the "Products" or the "Serums")) that were, in reality, unapproved dangerous drugs and products that posed serious undisclosed risks.  *See* Compl. (ECF 1), ¶¶ 1-2.  Plaintiff and other putative class members were deceived into believing the Serums were mere cosmetics that enhance the appearance of eye lashes, brows, or hair. Defendant's Serums contained a dangerous active ingredient, isopropyl cloprostenate ("ICP").  *Id.* ¶ 3.  ICP possesses dangerous side effects, which Defendant did not disclose.  *Id.*  Further, the presence of an active ingredient rendered the Serums unapproved new drugs. *Id.* ¶¶ 4-5.

Plaintiff's complaint in this matter, *Nixon I*, seeks economic and injunctive relief on behalf of a proposed nationwide class due to Grande's alleged wrongful actions, which Plaintiff alleges constitute violations of state consumer protection

laws (Count I), fraud (Count II), negligent misrepresentation and omission (Count III), breaches of express and implied warranty (Counts IV & V), negligence (Count VI), and unjust enrichment (Count VII).  The *Nixon I* case does not allege personal injury or other harm caused by the Serums. Any claims for personal injury, therefore, are expressly excluded from the claims released in the proposed Settlement.

Plaintiff subsequently filed an individual complaint for own bodily injuries only.  *See Nixon v. Grande Cosmetics, LLC*, No. 1:23-cv-1199 (D.N.J.) ("*Nixon II*"). The parties have since resolved Plaintiff's own bodily injury claims, and *Nixon II* has been dismissed.

**B.    Settlement Negotiations**

The parties engaged in informal discussions about potential resolution of *only* the *Nixon II* case in May and June 2023, but the parties never discussed resolution of *Nixon I* because Grande had entered into a Settlement Agreement in the Northern District of California, *Mandel v. Grande Cosmetics, LLC*, No. 3:22-cv-00071 (N.D. Cal.) case, in April 2023, with the hearing scheduled for preliminary approval on July 27, 2023. Ex. D (Honik Decl.).  During those discussions, the parties discussed documents, information, and data relating only to the scope of the personal injury case.

The *Mandel* court denied preliminary settlement approval for the reasons outlined above.  The parties in *Mandel* were unable to reach a revised settlement, at

which point counsel for Grande and Plaintiff engaged in settlement negotiations. The parties exchanged documents, information and data relating to the class, the nature of Grande's marketing and labeling for the Products, and the underlying safety and scientific issues pertaining to Plaintiff's economic-loss class claims alleged in *Nixon I*.  Ex. D (Honik Decl.).  The information exchanged included Plaintiff's receipt of all the same documents, discovery and other information produced by Grande to the *Mandel* plaintiff, as well as additional updated sales information relating to the serums.  Ex. D (Honik Decl.).

## III.   OVERVIEW OF SETTLEMENT

### A.    The Settlement's Key Terms

The Settlement contemplates the following settlement class:

> [A]ll current and former persons in the United States or its territories who purchased GrandeLASH-MD, GrandeBROW, or GrandeHAIR for personal, family, household, or professional purposes between January 1, 2018 and the date of the entry of an order granting preliminary approval to the Settlement Agreement excluding (a) any individuals other than Plaintiff Brenda Nixon who have pending litigation against Grande; (b) any Settlement Class Members who file a timely request for exclusion; (c) any officers, directors, or employees, or immediate family members of the officers, directors, or employees, of Defendant or any entity in which Defendant has a controlling interest; (d) any person who has acted as a consultant of Defendant; (e) any legal counsel or employee of legal counsel for Defendant; (f) any federal, state, or local government entities; and (g) any judicial officers presiding over the Action and the members of their immediate family and judicial staff.

Ex. A at ¶ 1.31.  The Settlement provides that Grande will create a non-reversionary settlement fund of $6,250.000.  *Id.* at ¶ 1.36.  From this amount, each eligible

Settlement Class Member will be entitled to receive an initial settlement payment of up to $150, *id.* at ¶ 2.2(a), and potentially more if a supplemental settlement distribution becomes necessary, *id.* at ¶ 2.2(b).  Additionally, Grande will be making changes and enhanced disclosures on the Products' labels and related marketing materials (e.g., its website) about the Products' ingredients.  *Id.* at ¶ 2.3 & Ex. E to Settlement.  This includes expanded warnings on the packaging, product insert, and website for the Products.  *Id.*

As consideration for the monetary and injunctive relief, Grande will receive a release from each Settlement Class Member as more specifically delineated in the Settlement with respect to claims that were or could have been alleged in the *Nixon I* action relating to the Serums.  Ex. A at ¶ 3.  The release explicitly excludes any individual personal injury or disease claims, including both existing claims as well as latent or unknown claims.  *Id.*  Also excluded are any individuals with pending claims of any kind against Grande.  *Id.*  This would include plaintiff Alexandra Mandel, who is the only individual known to the parties here to have an active matter in any court against Grande related to the Serums, besides Plaintiff here.  *See* Ex. D (Honik Decl.).

The Settlement provides that Plaintiff may seek attorneys' fees of up to one-third of the settlement fund plus costs, and also may seek a service award for Plaintiff up to $15,000.  Ex. A at ¶ 2.4.  Any service award, attorneys' fees, and costs will be

paid by from the monetary relief available to the Settlement Class, along with notice and claims administration fees. *Id.* at ¶ 2.5.   Angeion Group, the firm selected by the parties to serve as notice and claims administrator (*see infra* Part III. B)  has estimated the latter to be approximately $640,000, which is typical for a case and notice program of the sizes here.  *See* Ex. E (Weisbrot Decl.).

### B.    Notice and Claims Administration

The parties have chosen Angeion Group to serve as notice and claims administrator.  The Settlement contemplates a notice program consisting of direct notice in the form of mail, email, and internet notice, as well as publication notice and a settlement website.   Ex. A at ¶ 5.1.   The program also includes multiple enhancements over the program suggested in *Mandel* to increase both reach and claims rate.  *See* Ex. E (Weisbrot Decl.).

Both the proposed long-form and short-form class notice have been designed to give the best notice practicable; is tailored to reach members of the Settlement Class; and is reasonably calculated under the circumstances to apprise the Settlement Class of the Settlement and, specifically, each Settlement Class Member's rights (i) to make claims, (ii) to exclude themselves from the Settlement, or (iii) to object to the Settlement's terms, or Class Counsel's anticipated fee application and request for a service award for Plaintiff.  Ex. A at ¶¶ 5.1, 5.7, Exhibits B-D to Settlement.  All forms of notice will include, among other information: (i) a context-appropriate

description of the Settlement; (ii) the date by which Settlement Class Members may make a claim, exclude themselves from the Settlement Class, or object to the Settlement; (iii) the address of the Settlement Website; and (iv) the number of the toll-free telephone line. *Id.*

Requests for exclusion and claim must be sent to Angeion Group and postmarked or, in the case of claim forms, completed through the Settlement Website before their respective deadlines. *Id.* Objections must be filed with the Court, with copies of the objections sent to the parties' counsel, by the objection deadline. *Id.* The deadlines for objections, requests for exclusion, and claims are all before the Fairness Hearing. *Id.* In sum, the notice program constitutes sufficient notice to persons entitled to receive it, and satisfies all applicable requirements of law, including Federal Rule of Civil Procedure 23 and the constitutional requirement of due process.

### C.   Other Pertinent Settlements and Negotiations

***Mandel.*** As noted *supra* Part I, the Settlement adopts and builds upon the terms of the *Mandel* settlement that Judge Donato did not take issue with. Ex. D (Honik Decl.).

The *Mandel* court denied preliminary approval for three principal reasons: (i) 20% of the settlement's value ($1,250,000) came from coupons; (ii) the cash value of $5,000,000 in the settlement was insufficient; and (iii) the parties did not

adequately explain their speculative 3% claims rate.  *See* Ex. B (*Mandel* minute order denying preliminary approval); Ex. C (transcript of hearing in *Mandel* in which court denied preliminary approval).  The parties in *Mandel* were unable to negotiate a revised settlement that addressed these concerns.

Plaintiff here was successful in negotiating a superior resolution for the Settlement Class that addresses each of the issues raised by Judge Donato in rejecting the proposed settlement in *Mandel*.  The Settlement completely eliminates coupons.  Instead, the Settlement provides that Grande will contribute $6,250,000 in cash to a non-reversionary settlement fund.  This is a 20% increase in actual cash value over the $5,000,000 cash amount contemplated by the *Mandel* settlement.[1] Ex. D (Honik Decl.).

The Settlement compares even more favorably to the *Mandel* settlement on a net basis of cash available for Settlement Class Members.  The Settlement contemplates a request for attorneys' fees of up to one-third of the gross settlement value, litigation costs, a service award, and class notice costs.  Ex. A at ¶ 2.5.  The *Mandel* settlement contemplated the same.  *See* Ex. No. 3.:22-cv-00071 (N.D. Cal.), ECF 56-2 (*Mandel* settlement).  The *Mandel* settlement, however, anticipated a request for attorneys' fees of up to one-third of the total value of the cash plus coupons.  *Id.*  This meant that the *Mandel* plaintiff's intended request for attorneys'

---

[1]  $5,000,000 + $1,250,000 = $6,250,000, or a 20% increase over $5,000,000.

fees would reduce the cash available to Settlement Class Members much more sharply than Plaintiff's intended fee request here, because 20% of the *Mandel* settlement's value was comprised of coupons.

Put differently, the *Mandel* plaintiff intended to seek one-third of $6,250,000, or $2,083,333.33.  But there was only $5,000,000 settlement cash available under the rejected *Mandel* settlement.  Even assuming zero litigation costs, the anticipated attorneys' fees, service award, and notice/administration costs in *Mandel* would reduce the net cash available to Settlement Class Members to only about $2,352,000.[2]

In contrast, because the Settlement here contemplates a settlement fund comprised solely of cash (not coupons), the net cash available to Settlement Class Members after attorneys' fees, litigation costs, service award, and notice/administration costs would be about $3,577,000.[3]  This represents a **52% increase** in net cash value for Settlement Class Members above that which would have been available in *Mandel*.[4]

***Lash Boost Cases*.**  The mediator employed in *Mandel* provided extensive mediation assistance in a prior state court matter in which the plaintiffs made nearly

---

[2] The arithmetic is: $5,000,000 (available settlement cash) - $2,083,333.33 (attorneys' fees) – $15,000 (litigation costs and service award) - ~$550,000 (notice/administration costs) = ~$2,351,666.67.

[3] The arithmetic is: $6,250,000 (available settlement cash) - $2,083,333.33 (attorneys' fees) - $15,000 (litigation costs and service award) - ~$575,000 (notice/administration costs) = $3,576,666.67.  Note this reflects additional notice/administration costs above those contemplated in *Mandel*, to account for the multiple enhancements here to increase reach and claims rate.

[4] $3,577,000 is approximately 52% greater than $2,352,000.

identical allegations to those alleged here and in *Mandel*, but against a competitor selling eyelash serum containing IC, Rodan+Fields.  *See Lash Boost Cases*, No. CJC-18-004981 (Cal. Sup. Ct.).  The *Lash Boost Cases* resolved on a nationwide class basis for $30,000,000 in cash and $8,000,00 in coupons.  *See, e.g.*, Ex. F. However, Rodan+Fields not only has a much larger market share than Grande, but also sold significantly more units of eyelash serum than Grande and its product was nearly 2.5 to 3 times as expensive as Grande's most similar sized product.[5]

The *Lash Boost Cases* settlement provided for pro rata payments up to $175 to each eligible claimant who chose cash over coupons.  *See* Ex. F.  The Settlement here is proportionally better, as it contemplates pro rata payments up to $150 to each eligible claimant, plus more with proof of multiple purchases.  Ex. A at ¶ 2.2.  This compares favorably given that Rodan+Fields' product typically sells for 2.5 times what Grande's comparable lash product sells for at retail.  Ex. D (Honik Decl.).  The other terms of the Settlement here also track those in the *Lash Boost Cases* settlement. This includes, e.g., similar injunctive relief (*see* Ex. F) and a similarly multi-faceted notice program (*id.*).

Beyond settlement terms, it is notable that the *Lash Boost Cases* settled prior to the Ninth Circuit's ruling in *Nexus Pharmaceuticals, Inc. v. Central Admixture*

---

[5] The average retail price of a 3-month supply of Rodan+Fields' Lash Boost product is about $170, whereas the average retail price for Grande's comparable product, GrandeLash-MD Lash Enhancing Serum is about $68.  Ex. D (Honik Decl.).

*Pharmacy Services, Inc.*, 48 F. 4th 1040 (9th Cir. 2022), which altered the legal landscape on whether claims of the sort alleged in the *Lash Boost Cases*, *Mandel*, and here are impliedly preempted.  Prior to this Court staying Grande's deadline to file its motion to dismiss, Grande filed a pre-motion letter regarding its anticipated motion to dismiss. Grande's primary argument mirrored the argument adopted in *Nexus*, which is that the FDCA preempts Plaintiff's claims here. Since the *Nexus* decision, the First Circuit in *DiCroce v. McNeil Nutritionals, LLC*, No. 22-1910, 2023 WL 6056144 (1st Cir. Sept. 18, 2023) also held that a consumer's claims existed solely by virtue of alleged FDCA infraction and thus were impliedly preempted.

      ***Other Cases***. Numerous other over-the-counter, consumer product cases, especially those within this Circuit, have settled on terms similar to those here.  Some examples are set forth *infra* Part IV.

## IV.    THE SETTLEMENT SATISFIES THE PRELIMINARY APPROVAL STANDARD

      Rule 23(e) of the Federal Rules of Civil Procedure provides for judicial approval of the compromise of claims brought on a class basis if the proposed class action settlement is "fair, reasonable, and adequate." Approval of class action settlements is committed to the sound discretion of the district court. *See* Fed. R. Civ. P. 23(e). In exercising its discretion, district courts are mindful of the strong judicial policy favoring settlements. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*,

391 F.3d 516, 535 (3d Cir. 2004); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595-96 (3d Cir. 2010) ("strong presumption" in favor of class settlements).

According to the United States Court of Appeals for the Third Circuit, there is "an initial presumption of fairness when the court finds that (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*In re GMC*"), 55 F.3d 768, 785 (3d Cir. 1995); *see, e.g.*, *Zimmerman v. Zwicker & Assocs., P.C.*, No. 09-3905 (RMB/JS), 2011 WL 65912, at *2 (D.N.J. Jan. 10, 2011) ("Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason."). At the final approval stage, an expanded set of these factors are often referred to as the *Girsh* factors. *See In re GMC*, 55 F.3d at 785 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).

Here, all of the pertinent factors under *In re GMC* and *Girsh* support preliminary approval.

***Arm's Length Negotiation***. Typically, "[t]here is a presumption of fairness when a proposed class settlement, which was negotiated at arm's-length by counsel for the class, is presented to the Court for approval." *Newberg on Class Actions* § 11.41 (4th ed. 2002). Here, the parties engaged in arm's length negotiations. *See*

Ex. D (Honik Decl.).  Experienced counsel for each side, informed about the facts (see below) and familiar with the strengths and weaknesses of their respective positions, had repeated back-and-forth discussions about a potential settlement in principle.  *Id.*  Between the information exchanged between the parties, the risks of continued litigation, and an appreciation for the substantial value the Settlement delivers to the Settlement Class when evaluated in this context, the parties reached a resolution.  *Id.*

Among these important considerations are two very recent appellate decisions that arguably suggest claims such as those alleged here and in *Mandel* are impliedly preempted.  *See, e.g.*, *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35 (1st Cir. 2023); *Nexus Pharms., Inc. v. Central Admixture Pharm. Servs., Inc.*, 148 F. 4th 1040 (9th Cir. 2022).  While these out-of-circuit cases are not controlling here, and Plaintiff believes they are distinguishable, the reality is Grande has yet to file a motion to dismiss in this case and, therefore, Plaintiff would need to contend with Grande's likely preemption arguments based on *DiCroce* and *Nexus*, as Grande indicated in its pre-motion letter filed in this matter.  A very real possibility exists that, absent the Settlement, the Settlement Class Members would receive no relief here; or in *Mandel* for that matter, were Grande to seek reconsideration on the basis of *Nexus* (which is controlling Ninth Circuit precedent, where *Mandel* is filed) and *DiCroce*.

Further, to the extent the Settlement here tracks and enhances the terms of the *Mandel* settlement, it cannot be ignored that the latter was negotiated with the assistance of an able mediator.[6]  Ex. D (Honik Decl.).  If the *Mandel* settlement was negotiated with the assistance of an experienced mediator, than certainly the Settlement here, which is objectively more favorable to the class than the *Mandel* settlement, is fair, adequate, and reasonable.

***There Was Discovery.***  The parties exchanged substantial information, data, and documents between them prior to agreeing to the Settlement.  Grande produced to Plaintiff every single page of the 7,230 pages it had produced in the *Mandel* case, as well as documents updating the sales information for the Serums.  Ex. D (Honik Decl.).  This includes, e.g., materials about Grande's existing labeling and marketing for the Products; sales data for the Products; and manufacturing, safety, and complaint data concerning the Products.  *Id.*.  Moreover, Grande produced to Plaintiff here additional documents beyond that which Grande produced in *Mandel*, *see id.*, to provide the groundwork for the enhanced notice program to increase reach and claims rate.[7]

---

[6] The Hon. Jay C. Gandhi (ret.), former United States Magistrate Judge for the Central District of California.

[7] For instance, the *Mandel* plaintiff speculated a nationwide settlement class might consist of roughly 2.5 to 3 million consumers.  *See* Ex. D (Honik Decl.).  Grande has produced supplemental information to Plaintiff here, which was not provided in the *Mandel* case, which shows that the class size is much closer to 800,000 to 1 million consumers at most.  *See id.*

***Experienced Counsel.***  Both sides' counsel are qualified and competent class action litigators, well-positioned to evaluate the strengths and weaknesses of continued litigation, as well as the reasonableness of the Settlement. Plaintiff's Class Counsel has successfully handled national, regional, and statewide class actions, as well as other complex mass or multi-party actions, throughout the United States in both federal and state courts, including appointment as co-lead counsel in multiple recent large matters in this District such as *In re Valsartan, Losartan, & Irbesartan Products Liability Litigation*, No. 19-md-2875 (D.N.J.) and *In re Metformin Marketing and Sales Practices Litigation*, No. 20-cv-02345 (D.N.J.).  Ex. D (Honik Decl.).

***The Settlement Is Within the Range of Reasonableness.***  In preliminarily assessing whether a settlement falls within the range of reasonableness, courts examine the potential relief to the class.  *See, e.g.*, *Zimmerman*, 2011 WL 65912, at *2.  Here, the Settlement provides for payment to each eligible Settlement Class Member, up to a total of $150 initially, and potentially more if a supplemental distribution is necessary.  *See* Ex. A at ¶ 2.2.  This represents a payment of almost three times the average retail price paid by class members for the most popular Serum product.  Even the estimated class payment of about $51 would represent a payment of 75% of the retail price paid for the Serum.  This is greater than any reasonable price premium Plaintiff could seek from its claims in the lawsuit.

On top of this, Grande has committed to substantive marketing and related business-practice relief relating to the labeling, instructions, and other materials Grande uses to promote the Products. *Id.* The reasonableness of the Settlement must also be viewed against the complexity, expense, and duration of litigation, the stage of the proceedings, and the likelihood of success at trial. *See, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010); *Girsh*, 521 F.2d at 157.

Each of these considerations weighs in favor of approving the Settlement. The Settlement will deliver substantial monetary value to Settlement Class Members. Numerous cases involving the alleged false-marketing of consumer products settle on a nationwide basis in amounts approximate to, and often lower than, the total settlement amount here. *See, e.g.*, *Brodowicz v. Virgin Scent, Inc.*, No. 21-60643-CIV (S.D. Fla.) (nationwide $3,088,000 settlement involving allegedly contaminated hand sanitizer, final approval granted September 28, 2023); *Goldstein v. Henkel Corp.*, No. 22-cv-00164 (D. Conn.) (Right Guard aerosol antiperspirant products nationwide class settlement involving alleged benzene contamination, $1.95M common fund, final approval hearing set for December 13, 2023); *Evans v. Church & Dwight Co., Inc.*, No. 1:22-cv-06301 (N.D. Ill.) (Batiste dry shampoo products nationwide class settlement involving alleged benzene contamination, $2.5M common fund and $600,000 in vouchers, final approval hearing set for October 16, 2023); *Delcid v. TCP HOT Acquisition LLC & Idelle Labs, Ltd.*, No.

21-cv-9569 (S.D.N.Y.) (Sure/Brut aerosol antiperspirant products nationwide class settlement involving alleged benzene contamination, $3.65M common fund, final approval granted March 13, 2023); *In re J&J Aerosol Sunscreen Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 3015, 2013 WL 2284684, at * (S.D. Fla. Feb. 2023) (J&J aerosol sunscreen products nationwide class settlement involving alleged benzene contamination, $1.75M common fund and continuation of recall and refund program, final approval granted February 28, 2023); *Bangoura v. Beirsdorf, Inc.*, No. 22-cv-00291 (E.D.N.Y.) (Coppertone aerosol sunscreen products nationwide class settlement involving alleged benzene contamination, $2.3M common fund, final approval granted January 5, 2023).

Continued litigation of this matter would require substantial resources. Were this matter to continue without resolution, additional discovery would need to occur, specifically depositions and potential third-party discovery. Ex. D (Honik Decl.). Motion to dismiss briefing would need to occur. *Id.* The parties also have not yet briefed class certification, which likely would require expert disclosures and depositions, and motions for summary judgment have yet been filed. *Id.* All of these matters would require significant time and expense, and while Plaintiff and her counsel remain committed to Plaintiff's claims, they are also pragmatic that there is no guarantee of success and that substantial obstacles exist at the summary

judgment, class certification, and trial phases. *Id.* This is especially true given the very recent, albeit non-controlling, *Nexus* and *DiCroce* decisions.

Moreover, the Settlement was reached at a critical moment: after receipt of vital information from Grande, but before pivotal procedural and merits junctures after which the difficulty and expense of litigating Plaintiff's claims would have increased very substantially. This has enabled Plaintiff's counsel to evaluate with confidence the strengths and weaknesses of Plaintiff's claims and Grande's defenses. *Id.* Plaintiff also faces the very real prospect of being foreclosed from some or any recovery at all as a result of Rule 12(b)(6) motions, summary judgment motions, other motions practice, or at trial. *Id.*

## V.     THE SETTLEMENT SATISFIES FEDERAL RULE OF CIVIL PROCEDURE 23

"In order to approve a class settlement agreement, a district court must determine that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b)" are met. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009). "The requirements of Rule 23(a) and (b) are designed to insure that a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives." *Id.* (internal quotations and citation omitted). Here, the Settlement plainly satisfies Rules 23(a) and (b), and should be approved consistent with the "overriding interest in settling class action litigation." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535.

### A.    The Settlement Satisfies Rule 23(a)

Rule 23(a) lays out four threshold requirements for certification of a class action: numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.   *See* Fed. R. Civ. P. 23(a); *In re Pet Food Prods.*, 629 F.3d at 341, n.14.  The Settlement satisfies each of these requirements.

### 1.    The Class Is Numerous

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Although no magic number exists, courts typically find the numerosity requirement to be satisfied if there are more than 40 class members.  *In re NFL Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016).  The Settlement easily exceeds this threshold.  Grande sold the Products nationwide, for several years.  Its own data suggest there are many thousands of Settlement Class Members. Ex. D (Honik Decl.).

### 2.    Common Questions of Fact and Law Exist

Rule 23(a)'s commonality requirement also is satisfied here. "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re NFL*, 821 F.3d at 426-27 (internal quotations and citation omitted). Thus, commonality is "easily met" in most instances. *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Such is the case here. Plaintiff's and other Settlement Class Members' claims stem from a common course of conduct. Each Settlement Class Member bought one

of the Products, and each was exposed to the same uniform marketing and related informational disclosures (or, as alleged, omissions).  Each of them was harmed in the same alleged way. Grande's principal defenses also are common to all Settlement Class Members.

### 3.   Plaintiff's Claims Are Typical

The typicality requirement aims to assure that the interests of named class representatives align with the interests of the class. *See  In re NFL*, 821 F.3d at 427-28. The Third Circuit has "set a low threshold for typicality." *Id.* (internal quotations and citation omitted). To this end, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (internal quotations and citation omitted).

Plaintiff's claims are identical to those of the Settlement Class. As alleged in the Complaint, Plaintiff alleges the same type of economic injury arising out of the same conduct or circumstances to which other Settlement Class Members were exposed. Thus, Plaintiff meets the typicality requirement, and is well-suited to represent other Settlement Class Members.

### 4.   The Adequacy Requirement Is Met

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement focuses on

whether the representatives have any conflicts of interest with the interests of the class, and whether class counsel is capable of representing the class. *See Gen'l Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *In re NFL*, 821 F.3d at 428-29.

Plaintiff's interests are coextensive with, and not antagonistic to, the interests of the Settlement Class because Plaintiff and the absent members of the Settlement Class have an equally great interest in the relief offered by the Settlement, and there is no divergence between Plaintiff's interests and those of the other members of the Settlement Class. Ex. D (Honik Decl.). As noted above, the proposed class representative and other Settlement Class Members' claims arise from the same conduct and turn on the same alleged misrepresentations and omissions, and the Plaintiff seeks remedies equally applicable and beneficial to herself and all other Settlement Class Members. Further, the proposed class representative is represented by qualified and competent Class Counsel with extensive experience and expertise in prosecuting complex class actions. *Id.*

### B.    The Settlement Satisfies Rule 23(b)(3)

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions, and that class action treatment is superior to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  Predominance focuses on the cohesiveness of the proposed class.  *See, e.g.*, *In re NFL*, 821 F.3d at 434.

Cohesiveness exists where questions of law or fact common to the class will turn on the same evidence, and their resolution will have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member. *Id.* Courts are "more inclined to find the predominance test met in the settlement context." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304 n.29 (3d Cir. 2011) (en banc) (internal quotations and citation omitted).

Rule 23(b)(3) requires only "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 113 S. Ct. 1184, 1191 (2013). A plaintiff is not required "to prove that each element of her claim is susceptible to classwide proof." *Id.* at 1196. Rather, she need only show that common questions will predominate with respect to her case as a whole. *Id.*

Common fact and legal questions predominate here. The evidence necessary to prove liability for Plaintiff's claims is the same as it would be for each Settlement Class Member. Questions concerning whether Grande failed to make adequate disclosures about the ingredients in the Products are not only common to the Settlement Class, but are the predominant consideration in deciding whether Grande is liable to Plaintiff and the Settlement Class as a whole. *See, e.g.*, *In re NFL*, 821 F.3d at 434 (common questions predominated regarding defendant's "knowledge

and conduct as well as common scientific questions"). Liability questions common to the Settlement Class substantially outweigh any possible individual issues. The claims of Plaintiff and the Settlement Class are based on the same legal theories and the same conduct.

Further, resolution of the claims of Settlement Class Members through the settlement of a class action is far superior to individual lawsuits because it promotes consistency and efficiency of adjudication. *See* Fed. R. Civ. P. 23(b)(3). Absent certification, potential class members would lack incentive to pursue individual claims due to the relatively small individual amounts at issue. Individual class members have little interest or motivation to prosecute their own claims for low-dollar retail products. *In re NFL*, 821 F.3d at 435.

By comparison, the Settlement will result in substantial, timely, and real monetary and injunctive relief. Under these circumstances, use of the class mechanism is the superior alternative for resolving this dispute as it will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated. *See id.* After all, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without effective redress unless they may employ the class-action device." *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980).

## VI.   THE NOTICE PROGRAM IS APPROPRIATE

For due process purposes, notice to class members must be reasonably calculated to reach absent class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). The notice contemplated by the Settlement is reasonably calculated to reach Settlement Class Members and to inform them of the necessary information. *Eisen*, 417 U.S. at 173.

The parties have agreed to select Angeion Group as settlement administrator to effectuate the class notice and the claims process, and oversee the settlement fund. The administrator's costs will be paid from the settlement fund. Ex. A at ¶ 2.1(a). As discussed *supra*, the notice program includes direct email and mail notice, as well as an extensive nationwide publication notice campaign designed to maximize outreach to potential class members.

The contents of the proposed short-form and long-form notices adequately apprise Settlement Class Members of (i) the class definition, (ii) the nature of this action, (iii) the key terms of the Settlement, (iv) how to obtain additional information about the Settlement, (v) their rights to participate or opt-out and the deadlines for each, (vi) the scope of the release, (vii) the attorneys' fees and costs that may be sought, and that Court approval is necessary, and (viii) provides the time and location for the Final Approval Hearing, along with a description of same. Ex. A at ¶¶ 5.1, 5.7, Exhibits B-D to Settlement. This constitutes sufficient notice. *See*

MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.312 (outlining notice considerations); *see also, e.g.*, *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985) ("[F]irst-class mail and publication regularly have been deemed adequate under the stricter notice requirements . . . of Rule 23(c)(2)."); *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 99-100 (D.N.J. 2018) (approving mail and publication notice program).

Additionally, the notice program contains multiple enhancements above the program contemplated in the *Mandel* settlement. Ex. E. These enhancements are specifically intended to address the *Mandel* court's concern about what the eventual claims rate might be. The enhancements include additional targeted outreach via first-party targeting, additional notice through Legal Influencer, and additional online video advertisements, and are intended to increase both the reach of the notice campaign, as well as to foment claims. *Id.* Notably, Plaintiff's counsel has had very good recent success with Angeion Group in another matter, in which a nationwide publication notice program that attained an impressive ~81.68% reach, above the aspirational ~70% reach noted by the Federal Judicial Center. *See Brodowicz v. Virgin Scent, Inc.*, No. 21-cv-60643 (S.D. Fla.), ECF 95.

Given the supplemental information provided by Grande to Plaintiff, which was not made available earlier to the *Mandel* plaintiff, the size of the settlement class is much closer to 750,000 to 1 million consumers, as opposed to the 2.5 to 3 million

consumers hypothesized by the *Mandel* plaintiff.  Ex. D (Honik Decl.).  Even assuming the class size is at the top end of 1 million consumers, using an aggressive 7% claims rate,[8] each eligible claimant would receive approximately $51 — which, for a $68 product, represents a remarkable 75% recovery (much higher than the 34-55% recovery anticipated by the *Mandel* plaintiff).  Ex. D (Honik Decl.).

In any event, most of this is academic at this point.  The parties and the Court will be better equipped to assess the reach and claims rate at final approval, after the notice program has been implemented.  What matters at this stage is whether the notice program and claims process is reasonably tailored.  As discussed above, it is.

All of this assuages the *Mandel* court's concern about the claims rate initially projected by the *Mandel* plaintiff.  Given the foregoing, the Court should approve the form and content of the proposed notices and direct the administrator to effectuate the notice program as contemplated in the Settlement.

## VII.   PROPOSED SCHEDULE OF EVENTS

Plaintiff attaches an agreed-upon proposed preliminary approval order to this Motion which sets forth the pertinent dates for the approval, notice, claims submissions, exclusion requests, opt-outs, Plaintiff's motions for attorneys' fees, costs, and service award, objections and final approval.

---

[8] The Third Circuit has stated that claims rates in class settlements "rarely" exceed seven percent, "even with the most extensive notice campaigns."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*); *see* FTC Staff Report: Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, at p. 25 (reporting that even direct email notice campaigns had mean and median claims rate of 2% and 3%).

## VIII.  CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court preliminarily approve the Settlement, conditionally certify the Settlement Class, appoint Plaintiff as settlement class representative, appoint the undersigned as Class Counsel, approve the class notice program.  A proposed preliminary approval order is attached to this unopposed motion.

Dated: October 23, 2023

                                   Respectfully Submitted,

                                   */s/ Ruben Honik*
                                   Ruben Honik
                                   David J. Stanoch, Of Counsel
                                   Honik LLC
                                   1515 Market Street, Suite 1100
                                   Philadelphia, PA 19102
                                   Tel: 267-435-1300
                                   ruben@honiklaw.com
                                   david@honiklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below, I caused a true and current copy of

the foregoing to be filed and served upon all counsel of record by operation of the

court's CM/ECF system.


Dated: October 23, 2023                */s/ Ruben Honik*_____
                                       Ruben Honik