UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRENDA NIXON, individually, and on behalf of all others similarly situated,<br>    Plaintiff,<br><br>v.<br><br><br>GRANDE COSMETICS, LLC,<br>    Defendant | Case No. 1:22-cv-06639<br><br>Redacted Version |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S MOTIONS FOR FINAL APPROVAL, AND FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD**

Per this Court's direction at the Final Approval Hearing held on March 13, 2024, Plaintiff respectfully files this supplemental memorandum in further support of her motion for final approval, and motion for attorneys' fees, costs, and service award. This memorandum: (i) provides additional updates on the Claims Administrator's ongoing claims review since last month; (ii) further addresses the reasonableness of the Settlement; and (iii) provides additional detail about Class Counsel's time and effort for purposes of the lodestar cross-check.

**I.    Angeion Has Identified Additional Fraudulent or Invalid Claims**

On March 7, Angeion, the court-approved notice and claims administrator, reported to the parties and the Court that after completing its initial review, that at

1

most "176,038 claims initially [were] being considered valid, subject to further analysis." *See* Pls.' Suppl. Mem. (ECF 52) at 5 (citing Angeion Decl. (ECF 52-1) at ¶ 11). Of those total submitted claims, 143,868 claims were submitted without proof of purchase, and another 32,0180 were submitted with proof of purchase pending manual review. *See* ECF 52-1 at 7.

Since March 7, Angeion and its strategic partner, ClaimScore, have continued their claims review and verification process. *See* Ex. A (Angeion Decl.) at ¶ 5. The review and verification process identified additional fraudulent or invalid claims. The total number of presumptively valid claims has dropped to 109,402. *Id.* This translates to a claims rate of about 10.9% and a settlement payment of $29.81 per valid claim. *Id.* at ¶ 14.

The reason for the revised number of valid claims is multi-factorial. No sole metric explains all of the additional fraud or invalidity identified during Angeion's next-level review. *Id.* at ¶ 7. Yet, the single biggest explanatory factor is the technological sophistication of the fraud detected. *Id.* at ¶ 7-12. Angeion discovered that many claims ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* To root this out, Angeion, in collaboration with ClaimScore, had to apply even greater

2

scrutiny and technological sophistication than usual to thwart the fraud.[1]  *Id.*  The details of this are set forth in Angeion's and ClaimScore's respective declarations attached hereto as Exhibits A and B.  But at a high level, Angeion and ClaimScore had to ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████.  *See* Ex. A at ¶¶ 10-11; Ex. B at ¶¶ 11-19, 23-39.  This safeguard/validation process was technologically complex, time-intensive, costly, and proprietary.[2]  *See* Ex. A at ¶¶ 6, 13; Ex. B at ¶¶ 4, 7, 11, 23.

The 109,402 subsequently-reviewed/validated claims is inclusive of all 32,180 claims submitted with proofs of purchase that require manual review, which is not yet complete.  *See* Ex. A at ¶¶ 5.  That is, the 109,402 claims assumes that all 32,180 claims subject to manual review will be confirmed as valid.  *Id.*

---

[1] Unfortunately, the prevalence and sophistication of fraud in class action settlements is not limited to this case.  Angeion reports a marked uptick in technologically-sophisticated, fraudulent claims submissions in the first quarter of this calendar year.
[2] Plaintiff files this memorandum under seal, at Angeion's and ClaimScore's requests, because of the commercially sensitive, proprietary methods discussed in the declarations, and to avoid providing would-be fraudsters in future class settlements a how-to guide.

3

## II.     The Settlement's Value Is Within the Range of Reasonableness

At the March 13 hearing, the Court focused on the reasonableness of the Settlement; more specifically, the reasonableness of the estimated monetary amount received per valid claimant. The Court also raised concerns about whether the Settlement was 'better' for settlement class members than the aborted *Mandel* settlement.

The answer to both questions is 'yes.' The Settlement falls well within the range of reasonableness in this Circuit.

Importantly, the Settlement will significantly benefit the Settlement Class and is fair consideration for the release of their risky consumer claims in this case. Based on updated claims information, each claimant will receive $29.81. Under a price premium theory of damages, that cash exceeds the relief that a class member could have reasonably expected had Plaintiff successfully won a trial after obtaining class certification. In other words, the maximum amount each Class Member could have received after trial under a price premium theory would be 25% of the $68 purchase price—or $17. Each claimant will receive $10 more than that without even submitting proof of purchase. The Settlement also achieves important injunctive relief that will benefit Settlement Class Members who plan to keep using Defendant's products as well as countless other consumers.

On the other hand, had litigation continued, Settlement Class Members risk obtaining nothing—as capable defense counsel intended to raise complex preemption issues on the pleadings, intended to point to users' satisfaction with the products to defeat certification, and intended to put up a vigorous fight if the case had proceeded to trial. Balancing the *Girsh* factors, it is thus in Settlement Class Members' best interests for the Court to finally approve the Settlement. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 242 (3d Cir. 2001) (emphasizing that all the factors must be balanced against each other, and no one factor is dispositive).

As discussed below, the Settlement also objectively has a bigger cash fund than the aborted *Mandel* settlement and addresses each of the Judge Donato's concerns with the Mandel settlement.

### A. The Settlement Here Is 'Better' Than the Best-Case Scenario in a Hypothetical, Counterfactual World in Which the *Mandel* Settlement Was Approved

The Settlement here significantly increases the cash available to Settlement Class Members and resolves each of Judge Donato's concerns with the *Mandel* settlement in the Northern District of California. Even if the *Mandel* settlement were an appropriate measuring stick for this Settlement—and as discussed below, it is not—Settlement Class Members still come out better with the Settlement than the unapproved, and not approvable, *Mandel* settlement.

5

*First*, Judge Donato rejected the credit portion of the Mandel settlement—preferring real cash in the pocket of class members rather than credit which saves defendants from paying real money to Settlement Class Members. *See* ECF 25-2 (Judge Donato's order denying preliminary approval, stating: "The Court will not approve a settlement that involves vouchers."). Class Counsel eliminated the credit portion of the Settlement to benefit Settlement Class Members. The *Mandel* settlement is an inapt measuring stick for this Settlement because the former was not approvable, and per Judge Donato never would be approved. The alternative to the Settlement is no settlement at all.

Nevertheless, at the Final Approval Hearing, the Court queried whether some settlement class members might prefer coupons. Whether different, unbargained-for terms might be 'better' or 'fairer' for the settlement class is beyond the scope of the final approval inquiry. The focus remains on the terms of a proposed settlement as presented by the parties. *See, e.g.*, *Evans v. Jeff D*, 475 U.S. 717, 726-27 (1986) ("Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("A district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement between parties."); *see also, e.g.*, *In*

6

*Re Baby Products Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly.").

In any event, based on rates at which claimants chose credit in a class settlement involving a similar product—Lash Boost by Rodan & Fields—the vast majority of claimants prefer cash. We know that over 91% of all *Rodan & Fields* claimants chose cash. *See* ECF 52-3. Here is the breakdown:

| Total Claimants in *Rodan & Fields* Settlement | Claimants Selecting Cash | Claimants Selecting Coupon | % of Claimants Selecting Cash | % of Claimants Choosing Coupon |
|---|---|---|---|---|
| 105,483 | 96,185 | 9,298 | 91.2% | 8.8% |

In addition, even when claimants do choose coupons, they often fail to redeem them—adding to the reasons why the Third Circuit has long-advised courts to look askance at coupons.[3]

---

[3] *See, e.g.*, *In re GM Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806-810 (3d Cir. 1995) (expressing skepticism over coupons' value); *Galloway v. Kan. City Landsmen, LLC*, 833 F.3d 969, 971 (8th Cir. 2016) (redemption rate of 0.045%); *Rougvie v. Ascenia Retail Grp., Inc.*, No. 15-724, 2016 WL 4111320, at *11 (E.D. Pa. July 29, 2016) ("the parties predict an approximate 2% redemption rate"); *Davis v. Cole Haan, Inc.*, No. 11-cv-1826, 2015 WL 7015328, at *2 (N.D. Cal. Nov. 12, 2015) ("Three hundred and thirty-six (336) of 13,918 class members redeemed Settlement Vouchers before they expired," i.e., ~2.4%); *Buchett v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 694-95 (redemption rate between 0.002% and 0.11%), *modified*, 858 F. Supp. 944 (D. Minn. 1994); *Golba v. Dick's Sporting Goods, Inc.*, 238 Cal. App. 4th 1251, 1261 (Cal. App. 4th Dist. 2015)("of the 232,000 potential class members, only two had submitted claims for coupons");

*Second*, Judge Donato stated that the $5,000,000 cash fund in the Mandel settlement was too small. Here, Class Counsel achieved a 20% increase in the cash fund. Now, Settlement Class Members will take a greater cash share of $6,250,000 instead of the $5,000,000 available in the *Mandel* settlement.

Before improvements to the notice were made, Plaintiff estimated slightly more notice/claims administration costs ($640,000) than Plaintiff Mandel ($580,000). Assuming an equal amount of requested fees, expenses, and service award, the net amount available to Settlement Class Members was higher here than in *Mandel*. Here are the numbers in tabular, side-by-side format:

[see overleaf]

---

Blockovich, *Coupons and the Class Action Fairness Act*, 18 GEO. J. LEGAL ETHICS 1443, 1445, 1448 (2005) (typically "redemption rates are tiny," "mirror[ing] the annual corporate issued promotional coupon redemption rates of 1-3%"); Hantler & Norton, *Coupon Settlements: The Emperor's Clothes of Class Actions*, 18 GEO. J. LEGAL ETHICS 1343, 1347 (2005) (commenting on settlement where only 2 of more than 96,000 coupons were redeemed); Weinstein, *The Love/Hate Dynamics: Coupons Issued By Manufacturers*, 71 PROGRESSIVE GROCER 117 (May 1992) (discussing cases with redemption rates between 2% and 6%); Hamilton Lincoln Law Institute, *Coupon Settlements: Two Steps Forward, One Step Back* (Sept. 27, 2017) ("Historical evidence suggests the voucher redemption rate will be a low single digit"); *see also Cannon v. Ashburn Corp.*, No. 16-cv-1452, 2018 WL 1806046, at *16-19 (D.N.J. Apr. 17, 2018) (Bumb, C.J.) (cataloguing redemption rate concerns as to coupons).

| | | | |
|---|---|---|---|
| *Nixon* Settlement Value (All Cash) | $6,250,000.00 | *Mandel* Settlement Value (Cash Component Only) | $5,000,000.00 |
| Less Original Estimated Attorneys' Fees, Costs and Service Award in *Nixon*[4] | -$2,098,333.33 | Less Original Estimated Attorneys' Fees, Costs and Service Award in *Nixon* | -$2,098,333.33 |
| Less Original Estimated Notice and Claims Administration Costs[5] | -$640,000.00 | Less Original Estimated Notice and Claims Administration Costs[6] | -$580,000.00 |
| Original Estimated Net Amount Available to Class | **$3,511,666.67** | Original Estimated Net Amount Available to Class | **$2,321,666.67** |

After preliminary approval, these numbers changed in two ways. First, Plaintiff only requests 31.25% in attorneys' fees, not 33%. This increased the net amount of cash available to Settlement Class Members. Second, actual notice and claims administration costs were higher than originally estimated. The notice program enhancements (e.g., YouTube advertisements, first-party targeting, hiring a legal influencer) cost more money than the industry-standard notice program originally proposed. With the wider reach of notice came a pronounced uptick in fraud, which resulted in higher than usual claims administration costs.

Yet, even with the changes in these metrics, the Settlement here still came out on top of the aborted *Mandel* settlement:

---

[4] *See* ECF 25 at 8 & ECF 25-1 at ¶ 2.4.
[5] *See* ECF 25 at 9 & ECF 25-5.
[6] *See* ECF 3:22-cv-0071 (N.D. Cal.), ECF 51 at 12.

9

| | | | |
|---|---|---|---|
| *Nixon* Settlement Value (All Cash) | $6,250,000.00 | *Mandel* Settlement Value (Cash Component Only) | $5,000,000.00 |
| Less Requested Attorneys' Fees, Costs and Service Award | -$2,040,465.85[7] | Less Requested Attorneys' Fees, Costs and Service Award in *Nixon* | -$2,040,465.85 |
| Less Actual Estimated Notice and Claims Administration Costs | -$948,575.00[8] | Less Actual Estimated Notice and Claims Administration Costs in *Nixon* | -$948,575.00 |
| Originally Estimated Net Amount Available to Class | **$3,260,959.15** | Originally Estimated Net Amount Available to Class | **$2,010,959.15** |

In short, the Settlement significantly increased the cash fund available to Class Members compared to the *Mandel* settlement—meaning more cash will come out of Grande's pockets than it would have had Grande been able to pawn off credit on Settlement Class Members that costs Grande next to nothing and that Grande would likely never even have to redeem.

*Third*, Judge Donato was concerned with the claims rate estimated in the *Mandel* settlement. Class Counsel worked with Angeion and the Court to make several improvements to the notice program to increase the claims rate here—and it worked. In *Mandel*, the parties estimated that there would be much less than 100,000 claims submitted. Here, the Notice has far exceeded even the highest estimate in *Mandel*—with 109,402 valid claims submitted. The Settlement Class as a whole

---

[7] *See* ECF 48 at 1.
[8] *See* ECF 49-1 at ¶ 34.

benefited from the efforts to ensure that as many Settlement Class Members as reasonably practicable were made aware of the Settlement, and a great number of them (more than usually would be expected) exercised their rights to participate. Greater participation speaks to Settlement Class Members' positive views of the Settlement, which favors approval. *See, e.g.*, *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 389 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

### B. The Amount Per Valid Claim Here Is Within the Range of Reasonableness

The Settlement here is a victory for Class Members because it will provide $29.81 per claimant. That amount is ~43% of the $68 purchase price of Grande's most popular product—GrandeLASH. That amount is *more* than complete relief for Class Members under a price premium theory of damages. Under a price premium theory of damages, Plaintiff and Settlement Class Members would have been entitled to 25% of the $68 purchase price (at most)—or $17. The Settlement is thus exceedingly fair to Class Members in exchange for a release of their claims. *See, e.g.*, *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588 (N.D. Cal. 2020) (granting final approval of $6.25M settlement, coming out to approximately $4/claim, and approving $2M fee request; both settlement amount and fee request are identical to those here); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) (~$3/claim); *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 280 (E.D.

11

Mich. 2017) (granting final approval despite "less than robust claims response, resulting in the filing of approximately 19,000 claims for a $6 payment.").

Even under a full-refund theory of damages, which was much riskier given Grande's argument that many users received great value from using the Products, a cash award in the amount of ~43% of the purchase price is a significant benefit in exchange for the release of risky consumer claims. *See, e.g.*, *In re Cendant*, 264 F.3d at 241 (surveying final approval cases with rates of recoveries between 1.6% to 14%, especially in securities cases where information for direct notice is much more prevalent than consumer cases).

A final salient point. Settlement Class Members still make out 'better' here than were the *Mandel* settlement approved:

|  | Net Amount Available To Class | Amount Per Claim | % Recovery |
|---|---|---|---|
| *Nixon* Settlement | $3,260,959.15 | $29.81 | **43.83%** |
| *Mandel* Settlement (zero value for coupons) | $2,010,959.15 | $18.38 | **27.03%** |

This comparison holds true even if one were to imagine a hypothetical world in which coupons were approvable.[9] Thus, the Court should approve the Settlement

---

[9] If one assumed 8.8% of claimants here would choose coupons if given the choice (based on *Rodan & Fields*), and if one further assumed an extraordinarily high 20% coupon redemption rate, that would only add a few hundred thousand dollars in hypothetical 'value' to the *Mandel* settlement. Class Members as a whole still would come out 'better' under the Settlement than a hypothetically-approved *Mandel* settlement.

12

so $29.81 can be sent to each valid claimant waiting for their settlement payment.[10]

To disallow final approval would mean that each of those claimants risks getting nothing after years of protracted, costly litigation.[11]

---

[10] At the Final Approval Hearing, the Court wrestled with the estimated amount per valid claim of $17.61 being lower than the $51 amount originally estimated at preliminary approval. The updated number per claimant, $29.81, is closer to the original estimate. The reason the actual number is still lower than the estimate is because the notice program here was even more successful than anticipated. This sometimes happens. *See e.g.*, *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78 (1st Cir. 2015) (affirming final approval of settlement where parties initially estimated $20-$50 per claim, but higher than anticipated claims rate resulted in $8.44/claim). That more money was allocated to notice, which in turn resulted in more claims being submitted by more Settlement Class Members, is not a bad thing. The point of class notice is to satisfy due process requirements, and provide as wide of notice as reasonably calculated to reach absent class members. *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). A class settlement inures to the benefit of the class as a whole. *Id.* The goal is not to maximize individual recoveries to as few claimants as possible. *See, e.g.*, 4 NEWBERG ON CLASS ACTIONS § 12:18 (5th ed. 2019) (discussing how claims-made fund, unlike common fund here, has general effect of reducing participation rates). A high participation rate is laudable, not disabling. This is especially true where, as here, the alternatives—e.g., prohibitive expenses for each class member to prosecute their individual claims, or the protracted, risky continued litigation of this matter—weigh in favor of final approval. Regardless, the $29.81 available to each claimant is worthy consideration for the release of risky consumer claims that could result in nothing at all.

[11] Continued litigation is the only alternative absent approval. Grande believes it has strong merits and certification defenses, especially in light of the Ninth Circuit's recent *Nexus* decision. Further, Grande reportedly has seen a sharp drop in sales during the class notice period, which it reasonably attributes to the negative publicity from the expansive notice program here. Grande has stated it will not undertake another class notice period.

### III. Class Counsel's Time Committed to This Matter

As noted in Plaintiff's motion for attorneys' fees, costs, and service award (ECF 48), the pertinent Third Circuit factors weigh in favor of Plaintiff's requested attorneys' fees, costs, and service award.[12] Plaintiff's motion also set forth how Class Counsel intends to share the requested fee with Plaintiff Mandel's counsel to the extent the latter's work conferred a benefit to the Settlement Class. *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 180 (3d Cir. 2005).[13]

Class Counsel aptly views the Settlement as the product of a relay race. Mandel's counsel began the race. For example, they defeated Grande's motion to dismiss (as Plaintiff would need to oppose a nearly identical motion here), negotiated and obtained important fact discovery (all of which and then some was produced here), and initiated the settlement negotiations with Grande (which would have had to occur here). Plaintiff and Class Counsel then took the baton from Mandel's

---

[12] Plaintiff addressed each of the ten factors the Third Circuit directs court to consider when evaluating a request for attorneys' fees under Fed. R. Civ. P. 23(h). *See* Pls.' Mot. (ECF 48) at 4-12; *see also In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009) (summarizing factors); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2001) (same); *In re Prudential Ins. Co. of America Sales Pracs. Litig. Agent Actions*, 148 F.3d 283, 336-40 (3d Cir. 1998) (same).

[13] Because Mandel counsel's work directly benefited the Settlement Class in multiple concrete ways, at preliminary approval Plaintiff did not view it as consequential whether Mandel's counsel also were appointed as co-class counsel or not. Were this formality viewed as meaningful, Plaintiff and Class Counsel do not oppose amending the preliminary approval order to so appoint Mandel's counsel.

14

counsel, to get the Settlement to the finish line. One could not have occurred without the other.

For purposes of the lodestar cross-check, both Class Counsel and Mandel's counsel took care to excise any time that was not spent on work benefiting the Settlement Class. *See* Pls.' Mot. (ECF 48) at 14-20. The hours and rates are reasonable and square with those approved in this Circuit. *Id.*

On March 8, 2024, this Court's text order directed Mandel's counsel to submit supplemental briefing about their work that benefited the Settlement Class, and to provide full billing entries for same. *See* ECF 53. The Court's text order did not direct Class Counsel to provide full billing entries for their work. Nevertheless, in the interest of transparency and completeness, Class Counsel submit herewith their full billing entries as well. *See* Ex. C. Class Counsel note that they have incurred additional time since filing their fee request on January 4. *Id.*

Plaintiff also notes the percentage-of-recovery method of awarding fees remains the primary approach in this Circuit. As the Third Circuit has stated:

> [W]e reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. *See Prudential*, 148 F.3d at 342 (finding no abuse of discretion where district court "reli[ed] on time summaries, rather than detailed time records"). Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award. Lodestar multipliers are relevant to the abuse of discretion

15

analysis. But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.

*In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306-307 (3d Cir. 2005) (internal citations and footnotes omitted); *see also Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D. 340, 423 (2002) (lodestar cross-check is "not a full-blown lodestar inquiry" and courts "should be satisfied with a summary of the hours expended by all counsel at various stages with less detailed breakdown than would be required in a lodestar jurisdiction.").

Nonetheless, as Class Counsel's and Mandel counsel's full billing entries demonstrate, they collectively dedicated substantial time and effort to this matter on work that directly benefited the Settlement Class. The lodestar cross-check corroborates the reasonableness of the requested fee award.

## IV. Conclusion

The parties, the court-appointed notice/claims administrator Angeion, and Angeion's strategic partner ClaimScore have expended significant time, effort, and money to implement the expansive class notice program, and to mitigate the ensuing technologically-sophisticated fraud that occurred during the claims submission process. Angeion's and ClaimScore's efforts have identified 109,402 presumptively valid claims. This results in $29.81 per valid claim, which represents a substantial recovery that is well within the range of reasonableness in this Circuit. The excellent result here could not have been achieved absent the combined efforts of Class

Counsel and Mandel's counsel.  For these reasons, discussed more fully above and in the prior briefing, Plaintiff respectfully submits the Court should grant final approval and grant Plaintiff's motions for attorneys' fees, costs, and service award.

Representatives from Angeion and ClaimScore are available to address any further questions the Court has regarding technical or other questions about the claims review process.

Dated: April 3, 2024                              Respectfully Submitted,

*/s/ Ruben Honik*
Ruben Honik
David J. Stanoch, Of Counsel
Honik LLC
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 267-435-1300
ruben@honiklaw.com
david@honiklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I caused a true and current copy of the foregoing to be filed and served upon all counsel of record by operation of the court's CM/ECF system in sealed or redacted form, with an unredacted version emailed to counsel of record and provided to the Court under seal pursuant to the CM/ECF system.

Dated: April 3, 2024                    */s/ Ruben Honik*
                                        Ruben Honik